IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
NO. 7:20-CR-00201-BR-1

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| v. | ) ORDER |
| | ) |
| | ) |
| JOURDEN TAIREE SHEPARD, | ) |
| | ) |
| Defendant. | ) |

This matter is before the court on defendant's motion to suppress. (DE # 28.) The government filed a response in opposition. (DE # 32.) On 12 May 2021, the court held an evidentiary hearing during which the court heard the testimony of Sergeant Dawn Jauernik, Deputy Jay Floyd, and Detective Brad Reader and admitted documentary evidence from both parties. At the conclusion of the hearing, the court took the motion under advisement.

I. FACTS

On 14 August 2020, officers with the Onslow County Sheriff's Office Drug Enforcement Unit were conducting surveillance of two adjacent properties, known as the "Hill." Based on neighbors' complaints and having conducted controlled buys at that location through a confidential source, law enforcement considered the location an open-air market for narcotics. On the subject date, an officer observed defendant, who was driving a Dodge Charger, pull into the Hill, exit the vehicle, speak with someone, return to the vehicle, and pull off. Detective Reader, in an unmarked vehicle, followed defendant to the parking lot of a fast-food restaurant and called out defendant's vehicle's license plate over the radio to other officers. Defendant proceeded into the drive-thru lane. By this time, Sergeant Jauernik was in the restaurant's parking lot. She observed and ran the license plate, and it returned to a Dodge Durango. As

defendant left, Sergeant Jauernik pulled behind him on the highway. She activated her blue lights to conduct a traffic stop. Defendant did not immediately pull over, but rather he continued driving for approximately one-quarter of a mile.

Sergeant Jauernik stopped her vehicle behind defendant's and approached the driver window. She asked defendant for his license and registration. Defendant provided her with his license and the registration card for a Durango registered to defendant and his grandmother. Defendant told Sergeant Jauernik that the day before, he had purchased the Charger from a car dealer, and although the vehicle title was put in his grandmother's name, it was in fact his. He further stated that he transferred the license plate between the vehicles and that the car dealer informed him "he would take care of everything." Sergeant Jauernik requested paperwork to confirm the transaction.

At this point, two to three minutes into the stop, Deputy Floyd arrived on scene. He approached the passenger window, which defendant had rolled down. Sergeant Jauernik explained to Deputy Floyd what had occurred, and defendant handed Sergeant Jauernik a sealed envelope containing paperwork from the car dealer. She then asked defendant to step out of the vehicle, which he did while on his cell phone with the car dealer. Defendant handed his phone to Sergeant Jauernik. The car dealer informed her that defendant had purchased the Charger. She could not, however, confirm the identity of the person with whom she was speaking because the phone number associated with the call did not show a name or business. She, along with defendant and Deputy Floyd, walked to the back of defendant's vehicle, which was in front of her vehicle.

Sergeant Jauernik handed all documents defendant had given her to Deputy Floyd and asked him to check the license, check for warrants, and look through the car dealer paperwork. She then walked to her vehicle to get her drug detection dog, Bonito.

After patting down defendant and confirming he had no weapons, Deputy Floyd told defendant that Sergeant Jauernik had a drug dog and to not get the dog excited because the dog was a "bite" and "chase" dog. Leaving defendant outside between defendant's and Sergeant Jauernik's vehicles, Deputy Floyd returned to his own vehicle to perform tasks associated with the traffic stop.

Sergeant Jauernik gave Bonito a verbal command to sniff for narcotics, and she began to walk Bonito around defendant's vehicle. Bonito alerted on the passenger door with a sit. Sergeant Jauernik gave him a reward and then opened the passenger door. She gave Bonito a verbal command to sniff the interior of the vehicle. Bonito alerted on the center console—again by sitting, and Sergeant Jauernik rewarded him. She notified Deputy Floyd of the positive alert, who then got out of his vehicle and informed defendant of the alert and that they were going to search his vehicle. Sergeant Jauernik returned Bonito to her vehicle and searched defendant's vehicle, where she found narcotics, cash, and a gun in the center console. Defendant was detained and placed under arrest.

Segreant Jauernik contacted Detective Reader who arrived on scene and transported defendant for processing. Defendant was not issued a traffic citation. According to Sergeant Jauernik and Deputy Floyd, the stop from its inception to defendant's detention lasted about 20 minutes.

II. DISCUSSION

A. The Stop

3

Initially, defendant argues that the stop was not justified by reasonable suspicion. The government relies on, and Sergeant Jauernik testified to, two grounds to support the stop: a traffic offense and defendant's leaving a known drug area, the Hill, during law enforcement's narcotics operation.

> The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" "Because an automobile stop is a seizure of a person, the stop must comply with the Fourth Amendment's requirement 'that it not be 'unreasonable' under the circumstances.'" "As a result, such a stop 'must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct.'"
> Probable cause exists where "the officer 'had reasonably trustworthy information . . . sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense.'" Crucially, this principle holds true even for the most basic traffic offense: "'When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle.'" Moreover, an officer who observes a traffic offense may have probable cause even where he has additional motives for the stop. "[I]f an officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon the Fourth Amendment. That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity. . . ."

United States v. Williams, 740 F.3d 308, 311–12 (4th Cir. 2014) (citations omitted). Further, even if an officer was mistaken about whether the defendant's conduct was ultimately illegal, the stop is justified at its inception provided the mistake was objectively reasonable. See Heien v. North Carolina, 574 U.S. 54, 66 (2014) ("The Fourth Amendment tolerates only reasonable mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable."); United States v. Taylor, No. 3:20-CR-00110, 2021 WL 377686, at *4 (E.D. Va. Feb. 3, 2021) ("A search or seizure that is premised on a reasonable mistake of fact (or law) is not a violation of an individual's Fourth Amendment rights." (citing Heien, 574 U.S. at 57)).

According to Sergeant Jauernik, one of the reasons she stopped defendant's vehicle was because she believed the license plate displayed on it was fictitious. Pursuant to N.C. Gen. Stat.

§ 20-111(2), it is unlawful "[t]o display or cause or permit to be displayed . . . any . . . registration number plate knowing the same to be fictitious . . . ." Sergeant Jauernik observed defendant's vehicle's license plate, and upon obtaining information from her communications system that the license plate returned to a Durango, not a Charger, she had a reasonable suspicion that defendant was violating North Carolina law, and to the extent she may have been mistaken about that fact, her mistake was objectively reasonable given the circumstances. See United States v. Smith, No. 1:19-CR-312-1, 2019 WL 6769909, at *7-9 (M.D.N.C. Dec. 12, 2019) (holding the officer had at least reasonable suspicion that the vehicle was being operated with fictitious tags where he made a reasonable mistake in communicating the plate number and was thus advised the plate number was registered to a different vehicle). Therefore, the stop was justified. Because the court concludes that the suspected traffic offense alone justifies the stop, the court does not consider whether defendant's leaving the Hill, either alone or in conjunction with the traffic offense, justifies the stop.

B. The Search

Next, defendant contends that the search of his vehicle was not supported by probable cause. At the hearing, defendant suggested Bonito was not reliable based on purported inconsistencies between Sergeant Jauernik's testimony and report regarding Bonito's alert on the exterior of the vehicle and based on the rewards she gave him after alerting.

> [E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. . . .
> A defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may

5

examine how the dog (or handler) performed in the assessments made in those settings. . . . And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions.

In short, a probable-cause hearing focusing on a dog's alert should proceed much like any other. The court should allow the parties to make their best case, consistent with the usual rules of criminal procedure. And the court should then evaluate the proffered evidence to decide what all the circumstances demonstrate. . . . . If . . . the defendant has challenged the State's case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence. In all events, the court should not prescribe . . . an inflexible set of evidentiary requirements. The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test.

Florida v. Harris, 568 U.S. 237, 246-48 (2013) (citation omitted).

Sergeant Jauernik testified that she has been a canine handler for eight years and is currently a supervisor for the Onslow County Sheriff's Office canine program. She and Bonito have been together six years. Bonito is trained to detect cocaine, methamphetamine, heroin, and marijuana. Two organizations have certified him, and he is re-certified annually. Sergeant Jauernik and Bonito train together four hours weekly.

Regarding the search at issue here, Sergeant Jauernik testified that Bonito alerted on the passenger side of defendant's vehicle by sitting. In closing argument, defendant pointed out that Sergeant Jauernik did not testify to additional details about Bonito's behavior which were set forth in her report, namely, prior to sitting, and as they were walking up the passenger side of defendant's vehicle, Bonito "had a head snap, and went back to the door where he jumped up putting his two front paws on the window" and "took a deep breath." (Def.'s Ex. 1.) Defendant also pointed out that in her direct testimony, Sergeant Jauernik did not mention giving Bonito rewards upon his alerts to defendant's vehicle. Rather, she did not provide that information until

questioned on cross-examination. Finally, defendant noted Sergeant Jauernik's testimony that she gives a reward to Bonito *any* time he gives an alert, which, according to defendant, reinforces an alert, irrespective of whether the alert turns out to be an accurate indicator of narcotics.

The court deems Sergeant Jauernik a credible witness, and, considering all the facts, concludes Bonito was sufficiently reliable. As such, the court finds that given Bonito's positive alerts on the exterior and interior of defendant's vehicle, a prudent person would be warranted in believing defendant's vehicle contained narcotics.

Lastly, defendant argues that Sergeant Jauernik and Deputy Floyd extended the traffic stop to conduct the dog sniff.

> [Rodriguez v. United States, 575 U.S. 348 (2015)] held that, absent reasonable, articulable suspicion of criminal activity, a detaining officer may not extend an otherwise-completed traffic stop in order to conduct a dog sniff. The Court emphasized that, under *Terry's* second prong, the "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." In other words, to extend the detention of a motorist beyond the time necessary to accomplish a traffic stop's purpose, the authorities must either possess "reasonable suspicion or receive the driver's consent."

United States v. Williams, 808 F.3d 238, 245-46 (4th Cir. 2015) (citations omitted).

> The Supreme Court . . . clarified that extending a stop by even a de minimis length of time violates the Fourth Amendment.
> The "acceptable length of a routine traffic stop," however, "cannot be stated with mathematical precision." In evaluating the reasonableness of a stop, we consider "what the police in fact do," and whether the officers acted reasonably under the totality of the circumstances presented to them. Thus, an officer need not employ "the least intrusive means conceivable" in executing a stop, but he still must be reasonably diligent and must use "the least intrusive means reasonably available."
> An officer may engage in certain safety measures during a traffic stop, but generally must focus his attention on the initial basis for the stop. An officer may engage in "ordinary inquiries incident to" the traffic stop, such as inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants.

> While diligently pursuing the purpose of a traffic stop, officers also may engage in other investigative techniques unrelated to the underlying traffic infraction or the safety of the officers. Such unrelated activity is permitted under the Fourth Amendment only as long as that activity does not prolong the roadside detention for the traffic infraction. For example, an officer may question the occupants of a car on unrelated topics without impermissibly expanding the scope of a traffic stop. An officer also may engage a K-9 unit to conduct a "dog sniff" around a vehicle during a lawful traffic stop in an attempt to identify potential narcotics. However, because such a "sniff" or investigative questioning is intended to detect "ordinary criminal wrongdoing," these actions may not prolong the duration of the traffic stop absent consent of those detained or reasonable suspicion of criminal activity.

United States v. Hill, 852 F.3d 377, 381-82 (4th Cir. 2017) (citations omitted).

Relying on the five-minute lapse from when Deputy Floyd confirmed there were no outstanding warrants for defendant to when Sergeant Jauernik reported to dispatch that the dog had alerted and on the contention that reasonable law enforcement personnel would not have left defendant outside unguarded during the dog sniff, defendant argues that Sergeant Jauernik did not actually deploy Bonito until *after* Deputy Floyd confirmed there were no warrants. Therefore, defendant contends, the officers extended the stay after the usual incidents of the traffic stop had been completed and in violation of the Fourth Amendment. The court disagrees.

Sergeant Jauernik and Deputy Floyd consistently testified that Deputy Floyd was still in his vehicle when Bonito alerted. Contrary to defendant's argument, the court does not find it unusual under the circumstances here for the officers to have left defendant outside between vehicles while Sergeant Jauernik conducted the dog sniff and Deputy Floyd conducted the tasks associated with the traffic stop. The officers had confirmed by virtue of the pat-down that defendant had no weapons on him. Also, Deputy Floyd had warned defendant about the dog being a "bite" and "chase" dog. Therefore, it was unlikely defendant would harm the officers or flee. Further, Deputy Floyd testified that just because defendant had no outstanding warrants does not mean the traffic stop ends. Considering the totality of the circumstances, the court

concludes the officers acted reasonably and did not extend the traffic stop to conduct the dog sniff.

### III. CONCLUSION

Because the traffic stop was supported by reasonable suspicion, the vehicle search was supported by probable cause, and the officers did not extend the traffic stop to conduct the dog sniff, defendant's motion to suppress is DENIED.

This 27 May 2021.

_____
W. Earl Britt
Senior U.S. District Judge